JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

IDELL DEARRY, on behalf of himself and all others similarly situated,

**DEFENDANTS**

BILL FOLLIS, CHIEF OF THE MODOC NATION, in his individual and official capacities, et al.

**(b)** County of Residence of First Listed Plaintiff    Philadelphia, Pa.
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Ottawa County, Ok.
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Irv Ackelsberg, LANGER GROGAN & DIVER PC
1717 Arch Street, Suite 4020, Philadelphia, PA 19103
(215) 320-5660

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*     *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 890 Other Statutory Actions |
| | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. 1964

Brief description of cause:
Class action to recover damages for class of borrowers injured by illegal, high-interest loans

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
04/11/2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ Irv Ackelsberg

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IDELL DEARRY, *on behalf of himself and all others similarly situated,* | |
| Plaintiff, | Civil Action No. _____ |
| v. | **CLASS ACTION** |
| BILL FOLLIS, CHIEF OF THE MODOC NATION, *in his individual and official capacities,* ROBERT BURKYBILE, SECOND CHIEF OF THE MODOC NATION, *in his individual and official capacities,* THE MODOC TRIBE FINANCIAL SERVICES AUTHORITY d/b/a 500FASTCASH, and JOHN DOES Nos. 1-15. | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Idell Dearry, *on behalf of himself and all others similarly situated,* file this Class Action Complaint against the named Defendants and John Does Nos. 1-15. In support of his Complaint, Plaintiff alleges as follows:

## INTRODUCTION

1.      Plaintiff is a Pennsylvania consumer who received a series of illegal, high-interest loans over the internet, supposedly made by an online lending company named 500FastCash, which holds itself out as a company owned and operated by a Native American tribe. The most recent of these loans charged Plaintiff Annual Percentage Rates of 377.59% and 365%, requiring him to repay: (1) $300.00 in finance charges in less than eight weeks on a $1,000.00 loan; and (2) $320.00 in finance charges in less than four weeks on a $1,200.00 loan. Plaintiff has paid thousands of dollars in illegal interest on account of these loans.

2.      Usury—the practice of lending money at unreasonably high rates of interest—"is an ancient crime by which the powerful exploit the most poor and desperate." *Dunn v. Glob. Tr. Mgmt.,*

*LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020). Naturally, "[a]s ancient as the practice of usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition." *Id.* This case involves one of those schemes, which is commonly referred to as the "tribal lending" business model, or more colloquially, as "rent-a-tribe," a somewhat "recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012).

3.      Non-tribal payday lenders and third-party funders wishing to use this model to circumvent state legal prohibitions go searching for small tribes willing to serve as the consumer-facing façade for the usury scheme. In return, tribes receive a small portion of the revenue generated (the "rent" referred to in the "rent-a-tribe" label) and, often, some call-center jobs. The tribal entity playing this role serves as the nominal lender for the purpose of enabling the non-tribal actors actually running the operation to make legally incorrect claims that: (1) the loans are subject only to tribal law and not limited by the protections created by state usury and licensing laws; and (2) that they themselves are somehow vicariously protected by the tribe's sovereign immunity.

4.      Federal law does not grant Native American tribes any special power to make loans over the internet to consumers across the United States in violation of state usury restrictions. On the contrary, it is well settled that "[a]bsent a federal law to the contrary, [Native Americans] going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973). Nonetheless, the tribal employees named as Defendants have deliberately chosen to enter and facilitate the loansharking enterprise described below.

5.      Defendants have actively participated in the scheme and have conspired with each other and others to repeatedly violate state lending statutes resulting in the collection of unlawful debt from Plaintiff and the members of the class described below.

6.      Defendants and others not yet known to Plaintiff have been knowingly participating in the illegal lending enterprise, which has made and is making and has collected and is collecting on grossly usurious loans. This lawsuit challenges the legality of 500FastCash's high interest loans and seeks damages and declaratory relief against co-conspirators participating in this illegal scheme, including, most importantly, those whose identities have been deliberately concealed. More specifically, Plaintiff seeks relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"); Pennsylvania's usury laws; and the common law.

## JURISDICTION

7.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants have transacted their affairs in Pennsylvania, including the making and collection of loans to likely thousands of borrowers in Pennsylvania. Additionally, venue is also proper in this Court pursuant to 28 U.S.C. § 1965(b) because Plaintiff is a resident of this Division and a substantial part of Plaintiff's claims occurred in Pennsylvania.

## PARTIES

9.      Plaintiff Idell Dearry is a natural person residing in Philadelphia, Pennsylvania.

10.     Defendant Bill Follis is a resident of Oklahoma and is the Chief of the Modoc Tribe. As Chief, Follis has authority over the Modoc Tribe's businesses, including the Modoc Tribe Financial

Services Authority. Counts I, II, and IV are asserted against Follis in his individual capacity. Count III is asserted against Follis in his official capacity.

11.     Defendant Robert Burkybile is a resident of Oklahoma and is the 2nd Chief of the Modoc Tribe. As Second Chief, Burkybile has authority over the Modoc Tribe's businesses, including the Modoc Tribe Financial Services Authority. Counts I, II, and IV are asserted against Burkybile in his individual capacity. Count III is asserted against Burkybile in his official capacity.

12.     The Modoc Tribe Financial Services Authority d/b/a 500FastCash holds itself out as an entity formed under the laws of the Modoc Nation, a federally recognized Indian Tribe (the "Modoc Tribe").

13.     John Doe Defendants Nos. 1-15 are the as-yet unknown individuals and business organizations that designed, are operating, and have extracted most of the revenue from the 500FastCash enterprise. Their identity, which has been hidden as a key part of the underlying scheme, will be established in this litigation.

**FACTUAL ALLEGATIONS**

**A. The loans at issue violated Pennsylvania usury laws.**

14.      Usury laws prohibit lenders from charging borrowers excessively high rates of interest on loans.  These laws have ancient origins, as usury prohibitions have been part of every major religious tradition.  As Pope Francis has recently put it, "Usury humiliates and kills. Usury is a grave sin. It kills life, stomps on human dignity, promotes corruption, and sets up obstacles to the common good."[1]

---

[1] *See Pope Francis: "Usury humiliates and kills,"* Vatican News (Feb. 3, 2018), https://www.vaticannews.va/en/pope/news/2018-02/pope-francis-usury-financial-exploitation.html

15.     In the United States, every colony adopted a usury statute based on the English model.[2] *See Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009) (noting that "[u]sury legislation to cap interest rates on loans predates the founding of our country"). In addition to general usury laws, most states have adopted small-loan statutes that allow specifically defined, small-amount loans at higher rates, conditioned on the lender obtaining a license and complying with the restrictions contained in the statute.

16.     Pennsylvania has a clearly delineated public policy against usurious, unregulated lending as reflected by a statutory prohibition against charging consumers an annual interest rate exceeding 6% on unlicensed, unsecured loans for $50,000 or less. *See* 41 Purdons Pa. St. § 201; *Pennsylvania Dep't of Banking v. NCAS of Delaware, LLC*, 596 Pa. 638, 948 A.2d 752 (2008).

17.     Notwithstanding this prohibition, Plaintiff and the class were encumbered with unlicensed loans with interest rates grossly exceeding Pennsylvania's 6% rate cap, all originated by the usury scheme alleged here.

18.     Over the past decade, Plaintiff has been paying thousands of dollars in illegal interest to the entity purporting to be 500FastCash, based on supposedly single-payment loans that were converted by Defendants into continuous monthly payment obligations that Defendants collected from Plaintiff during the period June 2011 to April 4, 2019.

19.     The two most recent of these illegal loans were originated, respectively, on December 4 and December 6, 2018, both of which were applied for by Plaintiff from his computer in Pennsylvania. The December 4, 2018 loan was for $1,200, at a represented Annual Percentage Rate of 365%. The December 6, 2018 loan was for $1,000, at a represented Annual Percentage Rate of 377.59%.

---

[2] *See* Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1117 (2008).

20.     With regard to both of these loans, after entering his personal information on the 500FastCash website, including his Social Security number and bank account information, Plaintiff was approved nearly instantaneously.

21.     In both cases, a loan agreement was generated from the information he entered. According to this form loan agreement, 500FastCash is a wholly owned subdivision of the Modoc Tribe, a federally-recognized, sovereign American Indian Tribe.

22.     The agreement further provides:

By entering into this Extended Repayment Plan Agreement with 500FastCash, a sovereign tribal lending entity and a governmental instrumentality wholly owned by the Modoc Tribe of Oklahoma, a federally recognized Indian tribe, You acknowledge and agree that: (i) this   Extended Repayment Plan Agreement shall be governed exclusively by the laws of the Modoc Tribe of Oklahoma and applicable federal laws, without regard to the conflict of laws rules of any state; (ii) You shall be bound the laws of the Modoc Tribe of Oklahoma regarding this Extended Repayment Plan Agreement; (iii) this Extended Repayment Plan Agreement shall not be subject to or governed by any law of any state, including a state You may claim because of where you reside.

23.     The proceeds of these loans were dispersed to Plaintiff via electronic deposits into his Pennsylvania bank account.

24.     Before and after Plaintiff's receipts of these funds, he had periodic payments taken by Defendants, via electronic ACH debits from the same bank account. During the four years prior to filing this action, these payments totaled approximately $5,395—the vast majority of which was credited to interest.

25.     Plaintiff's loans violated Pennsylvania law because they included an interest rate that grossly exceeded the 6% rate cap provided in the same statute. 41 Pa. St. § 201.

6

**B.    500FastCash loans are being made throughout the United States, in violation of laws similar to those in Pennsylvania**

26.    Like Pennsylvania, most other states and the District of Columbia recognize a public

policy against usury and have adopted similar laws addressing high-interest loans.[3] These laws are vital

---

[3] Those states include Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. See Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Ind. Code § 24-4.5-5-202 (loans made without the proper authority are "void and the debtor is not obligated to pay either the principal or loan finance charge"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. § 286.4-991 (loans made without a license are void); La. Stat. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws ch. 140, § 110 (small loans made without a license are void);  Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.J. Stat. § 17:11C-33; N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be

public policy tools that state legislatures use to protect consumers in their states from the predatory conduct of high-APR small-loan lenders.

27.     Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, 500FastCash loans have been and continue to be made throughout the United States. Upon information and belief, thousands of consumers have become indebted to 500FastCash, on terms similar to Plaintiff.

**C.     500FastCash loans are examples of the "tribal" form of payday lending schemes, used by criminals to evade state and federal consumer protections.**

28.     Despite the multitude of state and federal protections aimed at  preventing usurious lending, the profits to be realized by making small, high interest loans are so high that some dishonest actors—aided by lawyers willing to help them create complex lending structures that conceal their involvement—are willing to accept the risk of litigation and liability for engaging in this criminal activity.

29.     Over the years, payday lenders have used various schemes to evade applicable state and federal protections. In one of these schemes, known colloquially as a "rent-a-bank" strategy, payday lenders would try to exploit banks' unique, federally-granted power to make loans in excess of state usury rates. Under arrangements made with a willing bank, the payday lender would market, fund and collect loans nominally made by a bank that, for its part, earned fees without assuming much, if any, financial risk for the lending.

30.     Because banks are insulated from state examination and regulation by virtue of federal, bank pre-emption doctrines, many payday lenders were, for a period of time, able to operate openly

---

recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code §§ 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

from storefronts, using these "rent-a-bank" arrangements to evade enforcement in states, like Pennsylvania, where payday lending is illegal.

31.     Beginning in 2005, however, the Federal Deposit and Insurance Corporation (hereinafter "FDIC") began to limit such "rent-a-bank" arrangements with payday lenders. *See* FDIC, Guidelines for Payday Lending, FIL-14-2005; *also see* Michael A. Stegman, *Payday Lending*, 21 *Journal of Economic Perspectives* 169, 178–79 (2007) (describing rent-a-bank scheme and regulatory reaction).

32.     As this and other regulatory pressure began to reduce the prevalence of rent-a-bank evasions,[4] the shadow payday loan industry turned to Native American tribes to replace the banks as the nominal lender behind their schemes, trying to take advantage of tribal insulation from state regulatory powers. Under this new "rent-a-tribe" model, the leadership of tribes would agree to play a figurehead, nominal lender role and accept the revenue and call-center jobs offered. In return, they also would agree to conceal the identity of the non-tribal actors who would actually operate the enterprise and extract most of the profits, by participating in a ruse that disguises the business as one managed by and for the sole benefit of the tribe.[5]

33.     To further advance the pretense of tribal control, and to protect the non-tribal principals from liability for their illegal conduct, various strategies are typically employed to keep the

---

[4] The United States Department of Justice also began cracking down on "rent-a-bank" schemes through an initiative that targeted financial intermediaries such as banks that rented their names to payday lending schemes and other financial scams. *See* Jessica Silver-Greenberg, *Justice Department Inquiry Takes Aim at Banks' Business With Payday Lenders*, N.Y. Times (Jan. 26, 2014).

[5] The use by payday lenders of tribal veneers as an artifice to evade state law has been widely publicized. *See, e.g.*, H.R., Committee on Financial Services, Dem. Staff Report, *Skirting the Law: Five Tactics Payday Lenders Use to Evade State Consumer Protection Law* at 15 (June 16, 2016); Carter Dougherty, *Payday Lenders and Indians Evading Laws Draw Scrutiny*, Bloomberg (June 5, 2012); Jeff Guo, *Many States Have Cracked Down on Payday Loans. Here's How Lenders Still Get Away with It*, Washington Post (Feb. 9, 2015).

focus on the tribes and deter consumers from enforcing their rights. Such measures include the adoption of tribal codes and regulations, and sometimes a tribal dispute resolution procedure, used to create the pretense of a legal infrastructure independent from state and federal law.

34.     Another central feature of the tribal business model is found in the agreements consumers are required to execute as a condition of receiving the illegal, usurious loans. The loan agreements are typically structured to include a waiver of all state and federal rights, in favor of tribal law and dispute resolution provisions. That way, the non-tribal principals running the scheme can claim that they have no liability for their violations of state and federal laws because the loan agreements waive the application of all such law.

35.     The strict enforcement of such agreements would lead to absurd results, including the waiver of all state and federal rights and the inability of consumers to pursue any redress for the predatory lender's illegal conduct. Not surprisingly, these waivers have been repeatedly invalidated by courts across the country.[6]

36.     During the last decade, federal and state law enforcement agencies have taken various actions to combat tribal lending schemes, including by example:

> a.     In 2017, the Justice Department obtained highly publicized criminal convictions under RICO against payday loan kingpins and their attorneys, who had used "rent-a-tribe" arrangements to attempt to

---

[6] *See Hengle v. Treppa*, 19 F.4th 324 (4th Cir. 2021); *Gibbs v. Stinson*, No. 3:18-cv-676, 2019 WL 4752792, at *14-18 (E.D. Va. Sept. 30, 2019); *see also Gingras v. Think Finance*, 922 F.3d. 112 (2d Cir. 2019); *Brice v. 7HBF No. 2, Ltd.*, No. 19-cv-01481-WHO, 2019 WL 5684529 (N.D. Cal. Nov. 1, 2019); *Brice v. Plain Green*, 372 F. Supp. 3d 955 (N.D. Cal. 2019); *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *Cooper v. W. Sky Fin., LLC*, No. 13 CVS 16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc.*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, No. 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

evade state usury law. *See United States v. Tucker*, No. 1:16-cr-00091-PKC (S.D.N.y.) (October, 2017 of Scott Tucker and his attorney, Timothy Muir, on all fourteen felony counts brought against them);[7] *United States v. Hallinan*, No. 2:16-cr-00130-ER (E.D.Pa.) (November, 2017 conviction of Charles M. Hallinan and his attorney, Wheeler K. Neff, on seventeen felony counts).[8]

b. The Consumer Financial Protection Bureau and state attorney general offices have filed civil actions against lenders using tribal lending models. *See, e.g., Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, 846 F.3d 1049 (9th Cir. 2017) (affirming power of CFPB to investigate tribal lending arrangements), *cert. denied*, 138 S. Ct. 555 (2017); *Commonwealth of Pennsylvania v. Think Fin., Inc.*, No. 14-CV-7139, 2016 WL 183289, at *1 (E.D. Pa. Jan. 14, 2016) (denying motion to dismiss state attorney general action under state RICO statute).

37.     For several years, the Modoc Tribe—a small Oklahoma-based Native American Tribe—has been openly inviting and accepting rent-a-tribe partnerships with the payday loan industry, using as a vehicle for these arrangements its corporation, the Modoc Tribe Financial Services Authority, or a predecessor entity, Red Cedar Services, Inc. ("Red Cedar").

38.     The Modoc Tribe previously operated through its business Red Cedar. *See Fed. Trade Comm'n v. Swatsworth*, No. 3:17-CV-340-GCM, 2018 WL 4016312, at *2 (W.D.N.C. Aug. 22, 2018).

39.     At that time, Red Cedar engaged AMG Services, Inc. ("AMG") as the exclusive servicer for 500FastCash loans. *Id.*

40.     Notorious payday lender Scott Tucker owned and operated AMG, in addition to several other companies associated with "high-interest, short-term loans" aimed at "cash-strapped customers." *Fed. Trade Comm'n v. AMG Cap. Mgmt., LLC*, 910 F.3d 417, 421 (9th Cir. 2018), *rev'd and*

---

[7] *See* United States Department of Justice, Press Release, *Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Oct. 13, 2017), *available at* https://www.justice.gov/usao-sdny/pr/scott-tucker-and-timothy-muir-convicted-trial35-billion-unlawful-internet-payday).

[8] *See* Press Release, United States Department of Justice, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case (Nov. 27, 2017) (https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-paydaylending-case).

*remanded sub nom. AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341 (2021), and *vacated sub nom. Fed. Trade Comm'n v. AMG Cap. Mgmt., LLC*, 998 F.3d 897 (9th Cir. 2021).

41.    "Between 2008 and 2012, Tucker's businesses originated more than 5 million payday loans, each generally disbursing between $150 and $800 at a triple-digit interest rate." *Id.*

42.    In 2018, Tucker was sentenced to more than 16 years in federal prison. *See* United States Department of Justice, Press Release, *Scott Tucker Sentenced to More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 3, 2018), *available at* https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday.

43.    Tucker and his attorney, Timothy Muir, had each been found guilty of fourteen separate crimes, "including racketeering, wire fraud, money laundering, and Truth-In-Lending Act ("TILA") offenses." *Id.*

44.    As explained by the Department of Justice: "For more than 15 years, Scott Tucker and Timothy Muir made billions of dollars exploiting struggling, everyday Americans through payday loans carrying interest rates as high as 1,000 percent. And to hide their criminal scheme, they tried to claim their business was owned and operated by Native American tribes. But now Tucker and Muir's predatory business is closed, and they have been sentenced to significant time in prison for their deceptive practices." *Id.*

45.    Tucker's scheme was made possible because he claimed, "that his lending businesses were protected by sovereign immunity, a legal doctrine that, among other things, generally prevents states from enforcing their laws against Native American tribes." *Id.*

46.    More specifically, as early as 2003, Tucker entered into agreements with several Native American tribes, including the Modoc Tribe. *Id.*

47.    Such agreements allowed tribes like the Modoc Tribe to claim that they owned and operated parts of Tucker's payday lending enterprises. Tucker and his lending businesses then, when necessary, claimed to be protected by sovereign immunity. *Id.*

48.    In return, tribes received minor payments from Tucker, approximately one percent of the revenue from the portion of Tucker's payday lending businesses that the tribes purported to own. *Id.*

49.    Individuals affiliated with Red Cedar and the Modoc Tribe also received federal punishments as a result of the scheme. *See, e.g.*, Brianna Bailey, *Oklahoma tribal payday loan companies executives agree to pay fines, stop predatory lending practices*, The Oklahoman (Mar. 21, 2015), *available at* https://www.oklahoman.com/story/business/local/2015/03/21/okla homa-tribal-payday-loan-companies-executives-agree-to-pay-fines-stop-predatory-lending-pract ices/60758551007/ ("Troy LittleAxe, tribal attorney for the Modoc Tribe of Oklahoma, agreed to pay $25,000 in fines and comply with federal lending laws. LittleAxe is the signatory for the Red Cedar Services bank account, which administers the online payday loan company www.500fastcash.com.").

50.    The Modoc Tribe, however, has not exited the usurious lending business. Instead, it has merely ceased its use of the Red Cedar moniker and ostensibly has ended its relationship with AMG and Tucker. The Modoc Tribe now operates 500FastCash through the Modoc Tribe Financial Services Authority and, upon information and belief, uses a different nontribal company to service the illegal loans.

51.    Indeed, now as then, the Modoc Tribe, on its own, lacks the financial resources, the expertise, and the technology needed to operate a national, multi-million-dollar lending enterprise.

52.    Notably, the Modoc Tribe's website does not list the Modoc Tribe Financial Services Authority as one of its businesses, but rather describes it as a "tribal service." *See* Modoc Nation, *Tribal Services*, https://modocnation.com/social-services/ (last visited Mar. 13, 2022).

53.     The website otherwise provides no information about the Modoc Tribe Financial Services Authority.

54.     The Modoc Tribe Financial Services Authority website likewise provides no substantive information about its operation. *See* https://mtfsauthority.com/coming-soon (last visited Mar. 15, 2022).

55.     In fact, it provides only the following statement on its homepage: "CHANGING THE WORLD OF ONLINE LENDING. TOGETHER. COMING SOON." *Id.*

56.     It further notes, like the 500FastCash website, that the Modoc Tribe Financial Services Authority is affiliated with the Modoc Tribe.

57.     An online search indicates that all or nearly all employees of the Modoc Tribe Financial Services Authority live and/or work in Kansas.

58.     Other than Follis and Burkybile, no employees of the Modoc Tribe Financial Services Authority appear to live in Oklahoma, where the Modoc Tribe itself is located.

59.     Upon information and belief, the Modoc Tribe operates 500FastCash on behalf of nontribal participants who design and direct the tribal lending scheme that charges unconscionable interest rates in violation of state usury and licensing laws.

60.     In order to engage in this extremely profitable, but illegal business, the deliberately hidden, nontribal principals have entered into agreements with the Modoc Tribe, Defendants, the Modoc Tribe Financial Services Authority, and others to make and collect on usurious loans in states across the country, including Pennsylvania, and to keep their identity hidden from consumers and regulators.

61.     Upon information and belief, each Defendant is aware of the numerous legal challenges to the tribal lending model and the illegality of making and collecting on usurious and void loans in other jurisdictions.

62.     With the assistance of the Modoc Tribe, Defendants establish and oversee 500FastCash to facilitate the illegal lending enterprise.

63.     Upon information and belief, the Modoc Tribe Financial Services Authority, 500FastCash, and other businesses formed by the Modoc Tribe, operate under the oversight and management of Defendants Follis, Burkybile, and John Does Nos. 1–15.

64.     Defendants Follis, Burkybile, and John Does No. 1–15 continue to facilitate the illegal lending scheme by allowing 500FastCash to make and collect on usurious and void loans in multiple jurisdictions, including Pennsylvania.

65.     Upon information and belief, neither the Modoc Tribe nor the Defendants nor the Modoc Tribe Financial Services Authority have applied for a consumer loan license in Pennsylvania or in other states with similar licensing laws.

66.     Upon information and belief, a significant portion of the lending operations done under the name 500FastCash are operated by third parties that are not located on tribal lands. These non-tribal outsiders supply all the lending capital and handle and control all or part of the marketing, underwriting, funding, risk assessment, compliance, customer complaints, accounting, lead generation, collections, and website management for the business. Upon information and belief, nontribal outsiders exert significant control over all or a portion of these activities regardless of the location where these activities occur.

67.     500FastCash's website includes the following disclaimer:

> 500FastCash™ is wholly owned by Modoc Tribe Financial Services Authority. Modoc Tribe Financial Services Authority is a tribally-owned corporation chartered pursuant to the laws of the Modoc Nation, a federally recognized Indian Tribe.

> The Modoc Nation is a federally recognized Indian Tribe organized under the Oklahoma Indian Welfare Act of 1936 with a constitution and bylaws approved by the United States Secretary of the Interior on July 27, 1990.

15

68.     The form 500FastCash consumer loan agreements prospectively waive the application

of all state and federal laws, stating, *inter alia*:

> BY ENTERING INTO THIS EXTENDED REPAYMENT PLAN
> AGREEMENT WITH 500FASTCASH YOU ACKNOWLEDGE
> AND AGREE YOU ARE VOLUNTARILY SEEKING TO
> ENTER INTO A CONTRACTUAL RELATIONSHIP WITH A
> TRIBAL LENDING ENTERPRISE AND GOVERNMENTAL
> INSTRUMENTALITY WHOLLY OWNED SUBDIVISION OF
> THE MODOC TRIBE OF OKLAHOMA, A FEDERALLY
> RECOGNIZED AND SOVEREIGN INDIAN TRIBE.
> 500FASTCASH IS REGULATED BY THE MODOC TRIBE OF
> OKLAHOMA AND LICENSED TO MAKE LOANS SOLELY
> UNDER THE LAWS OF THE MODOC TRIBE OF
> OKLAHOMA. 500FASTCASH IS NOT LICENSED IN ANY
> STATE. THE MODOC TRIBE OF OKLAHOMA AND ITS
> GOVERNMENTAL INSTRUMENTALITIES POSSESS TRIBAL
> SOVEREIGN IMMUNITY AND ARE THEREFORE NOT
> SUBJECT TO ANY SUIT IN ANY COURT IN ANY
> JURISDICTION, OR ANY OTHER FORUM, IN CONNECTION
> WITH THIS EXTENDED REPAYMENT PLAN AGREEMENT
> ABSENT A WAIVER OF THAT TRIBAL SOVEREIGN
> IMMUNITY.

69.     Additionally, each of Defendants is aware that numerous consumers have complained

regarding abusive lending practices used by the lending business. For example, the Washington State

Department of Financial Institutions has issued alerts about unlicensed lending conducted by the

Modoc Tribe, including 500FastCash.[9]

## CLASS ACTION ALLEGATIONS UNDER RULE 23

70.     Plaintiff brings this action on behalf of themselves and all others similarly situated

pursuant to Federal Rules of Civil Procedure Rule 23(a) and 23(b)(l), (b)(2), and (b)(3), as

representatives of the following Class:

> All persons who, at the time the loan was made, were residents of any
> states other than Nevada or Utah, or of the District of Columbia.

---

[9]     *500FastCash.com Not Licensed In Washington*, Wash. DFI (Jul. 8, 2016),
https://dfi.wa.gov/consumer/alerts/500fastcashcom-not-licensed-washington.

16

71.     The identity and of the members of the Class will be easily ascertainable from the records of Defendants.

72.     Plaintiff also asserts claims on behalf of the following subclass:

> All persons who made payments on such loans in an amount in excess of the amount of loan proceeds they received.

73.     **Numerosity. Fed. R. Civ. P 23(a)(1).** At this time, Plaintiff does not know the exact number of members of the Class. However, based on the class sizes in similar cases, Plaintiff anticipates that there are likely thousands of members. Thus, the class is so numerous that joinder of all members is impracticable.

74.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative Class and the RICO Subclass. All are based on the same facts and legal theories.

75.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the Class because his interests coincide with, and are not antagonistic to, the interests of the members of the Class; he has retained counsel competent and experienced in such litigation; and he has and intends to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff nor his counsel have any interests which might cause them not to vigorously pursue this action.

76.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Class, and there are no factual or legal issues that differ between the putative class members. These questions will predominate over the questions affecting only individual class members. The common questions include: (1) whether the form loan agreements contain invalid and unenforceable choice-of-law and mandatory dispute resolution provisions; (2) the identity of the John Doe Defendants who are

operating the "tribal" lending sham; (3) the facts surrounding the organization, structure and funding of the underlying enterprise, including with regard to control over the business and the performance of the various lender functions, as well as the flow of lending capital and revenue; (4) the extent of Defendants' knowledge and participation in the affairs of the enterprise; (5) whether the loans are "unlawful debt" for purposes of RICO; (6) whether Defendants violated RICO by collecting on the loans; and (7) what is the proper recovery for Plaintiff and the class members against Defendants.

77.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

78.     **Declaratory Relief**. **Fed. R. Civ. P. 23(b)(2).** Defendants have acted or refused to act on grounds that apply generally to the class, rendering declaratory relief appropriate respecting the class as a whole.

## FIRST CAUSE OF ACTION
## VIOLATION OF RICO, 18 U.S.C. § 1962(c)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

79.     Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

80.     Defendants are each a "person" as that term is defined in 18 U.S.C. § 1964(3), and are being sued in their individual capacities with regard to their own individual conduct.

81.     Defendants, along with the Modoc Tribe, the Modoc Tribe Financial Services Authority, and others were and continue to be members and associates of an internet lending association-in-fact that will be referred to hereafter as the "Usurious Lending Organization" or "the Enterprise."

82.     The Usurious Lending Organization, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4)—that is, a group of individuals and entities associated in fact.

83.     The members and associates of the Usurious Lending Organization shared various common purposes, including the evasion of state usury and licensing law, the operation of the 500FastCash website, the processing of applications from consumers across the United States the collection of payments from borrowers, and the division of generated revenues in accordance with written agreements.

84.     The Usurious Lending Organization assigned specific roles to the members and associates. The John Doe Defendants designed and directed the Organization and distributed the revenues generated in accordance with the said written agreements. The role of the named Defendants was primarily to establish and organize the tribal façade for the Organization and to take various measures designed to reinforce the fiction that the Organization is a tribal-run business.

85.     The Usurious Lending Organization has had a longevity sufficient to originate and collect tens of thousands of illicit loans.

86.     The Usurious Lending Organization has been engaged in, and its activities affected, interstate commerce. The named Defendants perform their roles from the tribal lands in Oklahoma but the John Doe non-tribal Defendants who are operating the Organization do so, upon information

and belief, from locations in other states. The Organization sends loan proceeds into and collects payments from, locations throughout the United States.

87.     RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).

88.     Defendants violated § 1962(c) of RICO, 18 U.S.C. § 1962(c), by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

89.     All of the loans made to Class members and collected by Defendants and Defendants co-conspirators included interest rates far in excess of twice the enforceable rate in their states.

90.     As alleged, each of Defendants participated in the collection of unlawful debt.

91.     Plaintiff and the RICO Subclass members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to the Enterprise, which money transfers would not have been made but for Defendants' conduct.

92.     Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiff and the RICO Subclass for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

<u>**SECOND CAUSE OF ACTION**</u>
**VIOLATION OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

93.     Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

94.     Defendants violated § 1962(d) of RICO, 18 U.S.C. § 1962(d), by conspiring to violate § 1962(c).

95.     Defendants each knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

96.     Plaintiff and the RICO Subclass members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

97.     Defendants are jointly and severally liable in their individual capacities to Plaintiff and the RICO Class for actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS**)

98.     Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

99.     Pennsylvania and other states with similar laws require a license for the conduct engaged in by 500FastCash in Pennsylvania and other states.

100.    None of the Modoc Tribe's businesses nor its subsidiaries or servicers were licensed to make loans in Pennsylvania or any other state in the United States.

101.    Because the loans were made without the required license and charged excessive interest rates, the loans are null and void.

102.    Additionally, as alleged herein, the loan agreements were violative of fundamental state public policy in Pennsylvania and other states with similar usury and licensing laws.

103.    Plaintiff and members of the Class are subject to ongoing harm absent a declaration that the loans were void, including adverse credit reporting of the invalid loans.

104.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

105.    Accordingly, Plaintiff seeks a declaratory judgment that the loan agreement is invalid and the loan was never collectable.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

106.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

107.    Defendants have been unjustly enriched by their continued possession of funds illegally taken from Plaintiff and members of the Class who were experiencing financial difficulties and taken advantage of through the 500FastCash online payday lending scheme.

108.    In equity and good conscience, those funds collected in excess of the legal rate of interest permitted by Class members' home states should be returned to the people victimized by Defendants' unlawful scheme.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

A.    An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2), and (b)(3) and appointing Plaintiff as class representative and his counsel as class counsel, as soon as practicable;

B.    An Order declaring that the loan agreements are void and unenforceable;

C.    An Order awarding monetary damages against Defendants in their individual capacities, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

22

D.      An Order awarding statutory damages against Defendants in their individual capacities in accordance with proof and in an amount consistent with applicable precedent;

E.      An Order awarding interest at the maximum allowable legal rate against Defendants, in their individual capacities on the foregoing sums;

F.      An Order awarding Plaintiff his reasonable costs and expenses of suit, including attorneys' fees against Defendants, in their individual capacities; and

G.      Such further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand trial by jury of all issues so triable.

Respectfully submitted,

Dated: April 6, 2022

Irv Ackelsberg, PA Bar No. 23813
John J. Grogan, PA Bar No. 72443
Mary Catherin Roper Pa Bar No. 71107
LANGER, GROGAN & DIVER, PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703
Email: iackelsberg@langergrogan.com

Kristi C. Kelly (*pro hac vice pending*)
Andrew J. Guzzo (*pro hac vice pending*)
J. Patrick McNichol (*pro hac vice pending*)
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
kkelly@kellyguzzo.com